# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY ANN BROWN,<br><br>    Plaintiff,<br><br>    v.<br><br>NANCY A. BERRYHILL, ACTING COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 1:17-cv-01457 (EPG)<br><br>**FINAL JUDGMENT AND ORDER REGARDING PLAINTIFF'S SOCIAL SECURITY COMPLAINT** |

This matter is before the Court on Plaintiff's complaint for judicial review of an unfavorable decision of the Commissioner of the Social Security Administration regarding his application for Supplemental Security Income. The parties have consented to entry of final judgment by the United States Magistrate Judge under the provisions of 28 U.S.C. § 636(c) with any appeal to the Court of Appeals for the Ninth Circuit. (ECF Nos. 5, 10).

At the hearing on November 6, 2018, the Court heard from the parties and, having reviewed the record, administrative transcript, the briefs of the parties, and the applicable law, finds as follows:

Plaintiff first argues that the ALJ erred in finding that Plaintiff's peripheral neuropathy was not a Medically Determinable Impairment. The Commissioner concedes that the ALJ committed legal error, but that such error was harmless because the ALJ proceeded to evaluate

1

whether Plaintiff's peripheral neuropathy was a severe impairment. The Court agrees that this error was harmless because the ALJ fully evaluated the severity of peripheral neuropathy notwithstanding her failure to include that impairment as a Medically Determinable Impairment.

Plaintiff next argues that the ALJ erred in concluding the Plaintiff's peripheral neuropathy was not a severe impairment. "[A]n impairment may be found not severe only when evidence establishes a slight abnormality that has no more than a *minimal effect* on an individual's ability to work." Corrao v. Shalala, 20 F.3d 943, 949 (9th Cir. 1994) as modified on reh'g (Apr. 7, 1994) (internal quotations omitted).

The ALJ's relevant finding on this point is as follows:

The claimant testified she last worked in December 2010 after having lost an election for County supervisor in Inyo County, where she had served as a County supervisor since January 2007. She believes she is incapable of working due to severe peripheral neuropathy. She was going to try to go back to work until January 2014, when she feels her condition began to medically deteriorate.

The medical evidence during the period in question from the claimant's alleged onset date (January 1, 2011) through her date last insured (December 31, 2014) consists largely of progress notes from primary care physician George Perdikis, M.D. (Exhibits 1F, 2F, and 7F). Although Dr. Perdikis has stated he has been treating the claimant since October 18, 2007 on a monthly basis, the earliest progress note submitted appears to be dated January 8, 2009 (Exhibit 1F, p. 81). In any event, all of the progress notes during the period in question indicated a diagnosis of peripheral neuropathy (Exhibit 1F, pp. 6-50; Exhibit 2F; and Exhibit 7F, pp. 15-22). However as indicated by Dr. Stein in his testimony, the progress notes during the period in question do not contain any clear description of what specific neurological problem the claimant allegedly had or on what basis the diagnosis of peripheral neuropathy was made. Specifically, he notes that there was no indication in the record of any motor functioning limits, atrophy, muscle weakness, joint or reflex abnormalities, or any limitations in straight leg raising. De. Stein noted that the claimant did not actually undergo EMG and nerve conduction studies until September 14, 2015 (Exhibit 11F) well after the date last insured. That study was interpreted as abnormal, and revealed findings consistent with a moderately severe diffuse, symmetric mixed axonal and demyelinating peripheral neuropathy most likely secondary to diabetes mellitus. As described in the claimant's history at the time of the study, she allegedly developed foot pain in August 1995, and over the years allegedly lost the sensation in her feet and in 2009 developed burning pain in her hands. The claimant was also noted to have undergone gastric bypass surgery in 2006. However, as stated above, Dr. Stein emphasized that the actual progress notes from Dr. Perdikis during the period in question did not contain any actual objective clinical or laboratory evidence to support a diagnosis of peripheral neuropathy. While the claimant's condition

appears to have somewhat fluctuated in intensity, on virtually every office visit the claimant was noted to have a full range of motion in the cervical and lumbar spine (with some occasional limitation of motion in the cervical spine), negative straight leg raising, normal strength and reflexes, and a normal gait. Her chief complaints appear to have been pain and tenderness in her hands and feet, with fatigue. Her condition was generally described as stable on virtually all office visits, and she was noted to be able to perform activities of daily living with, at most, moderate difficulty.

On February 18, 2011, Dr. Perdikis indicated the claimant was working full time, had no new complaints, and had good pain relief (Exhibit 2F, p. 39). On September 1, 2011, it was noted the claimant was having only mild residual pain in her hands and feet, and that she stated her pain medication was continuing to provide adequate relief (Exhibit 2F, p. 30). It was further noted that the claimant's mood, memory, energy, and sleep were all good. The progress notes throughout most of 2012 indicated that the claimant now complained of more pronounced pain in the affected areas (Exhibit 2F, pp. 4-24). The progress notes in 2013 indicated a more moderate level of residual pain in the affected areas (Exhi9bit 1F, pp. 16-44). However, in both 2012 and 2013, the clinical examinations continued to show the claimant had a steady gait, a full range of motion in the lumbar spine, and normal neurological findings. Notably, by December 31, 2013, the claimant now began to describe an increasing level of better overall pain control with her medications, beginning with a 30% level (Exhibit 1F, p. 16). By January 28, 2014, overall pain relief had increased to 40%, and by March 25, 2014 had increased to 50% (Exhibit 1F, pp. 10 and 14). On May 20, 2014, the claimant was described as being stable and active (Exhibit 1F, p. 7). Her pain control level was now at 60% (Exhibit 1F, p. 6). The claimant's pain relief was still noted to be at 60% on October 7, 2014 (Exhibit 7F, p. 21). The last progress note during the period in question (December 23, 2014) noted the claimant was having moderate residual pain with a 30% overall relief from medications (Exhibit 7F, p. 15).

In an assessment dated July 14, 2015, Dr. Perdikis contended the claimant was restricted to less than a full range of even sedentary work due to peripheral neuropathy, and that her condition was deteriorating (Exhibit 8F). However, aside from the fact that there is no objective evidence to support any limitations from peripheral neuropathy during the period in question, it is emphasized that (as noted by Dr. Stein in his testimony) the most important reason why no serious weight can be given to the limitations alleged by Dr. Perdikis is he clearly stated that he felt these limitations applied since 1984 (Exhibit 8F, p. 5). Clearly, the claimant engaged in substantial gainful activity for many years at a very high level of functioning since 1984, even including medium exertional work, which renders the opinion of Dr. Perdikis unreliable and one that cannot be taken seriously. The assessment of Dr. Perdikis also conflicts with the claimant's own activates of daily living in that she engaged in substantial gainful activity up to the medium level during the period addressed in the assessment in question. The claimant also stated on a Function Report dated April 25, 2014 that she had no problems performing her own personal self-care functions, could prepare simple meals, was able to feed the dogs with help from her family, was performing light household

3

> tasks, was driving a car, was going out every day, and was able to go shopping (Exhibit 8E). In a clinic visit note dated July 8, 2014, the claimant stated that she was able to take care of the yard (Exhibit 14F, p. 8). Therefore, even though Dr. Stein stated that the limitations suggested by Dr. Perdikis were possible for a person with neuropathy, such limitations are totally unsubstantiated in this case, since they contradict the claimant's proven capacity to work at substantial gainful activity during the time period addressed—the claimant's own testimony indicated that her condition from 2011 through 2014 was exactly the same as it was in 2008, and that it only became worse in the last two years when she became resistant to her medications. Therefore, according to the claimant's own testimony, the condition present as of her date last insured was the same as during the period when she was engaged in substantial gainful activity. Notably, the vocational expert characterized that work as being at the light, skilled level, and the claimant testified to the fact that it even involved travel several times a month. Overall, the record supports the testimony of Dr. Stein that there was no evidence of a severe impairment prior to the claimant's date last insured. There was only evidence of a gastric disorder, which was non-severe and did not interfere with the claimant's ability to work.

(A.R. 18-20).

Plaintiff challenges this finding for the following reasons: the ALJ "ignored compelling evidence as to her Peripheral Neuropathy," the ALJ disregarded the objective examination findings of Dr. Perdikis, the ALJ ignored the State Agency opinions that Ms. Brown's Neuropathy was a severe impairment, the ALJ ignored a disability finding dated January 4, 2011, and the ALJ ignored the examining expert opinion of Dr. Will.

Regarding the first reason, the Court fails to find error in a failure to ignore "compelling evidence as to her Peripheral Neuropathy." The ALJ quite extensively evaluated the record and noted the repeated references to peripheral neuropathy, yet also explained that objective tests appeared normal during this time, that she was responsive to medication, and that she had worked during some of the period subject to this impairment. Notably, the Plaintiff does not point to any statement in the extensive analysis that is an incorrect statement of the record. The ALJ's evaluation of the medical evidence is supported by substantial evidence.

As to the second reason, referencing "extensive objective examination findings" by Dr. Perdikis, Plaintiff only points to Dr. Stein's testimony at the hearing regarding Dr. Perdikis' opinion. Plaintiff does not cite to any extensive objective examination findings demonstrating a severe impairment during the relevant timeframe. Moreover, the hearing transcript cited by

4

Plaintiff does not support Plaintiff's position. On the contrary, in those very pages, Dr. Stein testified at the hearing that the objective evidence was not until the testing in September of 2015 (after the relevant period) without any previous examination (A.R. 67), that there was no note by the treating physician who has been prescribing the opioids as to what the diagnosis is and what his ultimate goals are, (A.R. 67), "we need objective evidence behind it in order for it to have any validity," (A.R. 72), "nerve tests just demonstrate that there is a sensory and a motor impairment. It says nothing about the capability of the patient," (A.R. 72), and "[t]hat test just tells me is there impairments in the nerve. It doesn't tell me what the capacity of the patient is for doing work or what the sensory problems are which might impair their ability to – to do work," (A.R. 73).

Concerning Dr. Perdikis opinion itself, the ALJ evaluated that opinion extensively and provided specific and legitimate reasons supported by substantial evidence for rejecting it, including that he states that the limitations first applied in 1984. (A.R. 699). The ALJ also explained at length how Plaintiff had been working throughout much of this time, and testified that her symptoms became worse in the year before the hearing, which took place in January 2017. (A.R. 33 ("Q: Do did it get worse in 2014 than it was in 2011? A. No. Q: When did it start getting worse? A: Probably the last year it's gotten worse. Q: The last two years? A: No. It's been the same, but the last year it's gotten worse. I don't think it's gotten worse. My medication I've become more resistant to.").

The Court agrees, however, that the ALJ ignored the State Agency opinions that Ms. Brown's Neuropathy was a severe impairment. Both state agency physicians gave the opinion that Plaintiff's peripheral neuropathy was "severe." (A.R. 86, 97). These opinions are unaddressed, which is legal error. *See* SSR 96-6P, *Titles II & Xvi: Consideration of Admin. Findings of Fact by State Agency Med. & Psychological Consultants & Other Program Physicians & Psychologists at the Admin. Law Judge & Appeals Council* (S.S.A. July 2, 1996) ("1. Findings of fact made by State agency medical and psychological consultants and other program physicians and psychologists regarding the nature and severity of an individual's impairment(s) must be treated as expert opinion evidence of nonexamining sources at the administrative law judge and Appeals Council levels of administrative review. 2. Administrative

law judges and the Appeals Council may not ignore these opinions and must explain the weight given to these opinions in their decisions.").

The Commissioner admits that the ALJ erred in failing to consider such opinions, but argues that the error was harmless because both State Agency opinions ultimately concluded that Plaintiff was not disabled. It is true that even if an ALJ errs by finding one or more of a plaintiff's alleged impairments non-severe, such error is harmless if he or she nevertheless considers the impairments when determining the plaintiff's RFC at step four. *See Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007) (failure to address particular impairment at step two harmless if ALJ fully evaluated claimant's medical condition in later steps of sequential evaluation process); *see also Stout v. Commissioner*, 454 F.3d 1050, 1055 (9th Cir. 2006) (ALJ's error harmless when "inconsequential to the ultimate nondisability determination"). Here, however, the ALJ did not consider the impairments at step four. Thus, while it is possible that the consideration of the opinions would not change the ALJ's determination at step 2 and/or would have resulted in a finding of non-disability at step 4, the Court cannot conclude on this record that evaluation of these opinions would not have changed the result in this case. The Court will remand to the ALJ to consider and address these two State Agency opinions.

Regarding the argument that the ALJ ignored a disability finding, the parties disagree as to whether the ALJ had an obligation to consider that finding. Exhibit 15F is a notice of placement on disability retirement roll, finding disability retroactive to January 4, 2011. (A.R. 813). It does not contain any reasoning supporting the finding of disability.

Under Social Security Ruling ("SSR") 06-03P,[1] the ALJ is required to consider all available evidence, including "decisions by other governmental and nongovernmental agencies about whether an individual is disabled or blind." SSR 06-03P, 2006 WL 32329939, at *1 (2006). "A decision by any nongovernmental agency or any other governmental agency about whether you are disabled or blind" is not a decision by the Commissioner and "is not binding on us." *Id.* at *6. "However, we are required to evaluate all the evidence in the case record that may have a

---

[1] SSR 06-03P has been rescinded, effective for claims filed on or after March 27, 2017. *See* Fed. Reg. Notices, Vol. 82, No. 57, p. 15263 (2017).

bearing on our determination or decision of disability, including decisions by other governmental and nongovernmental agencies. Therefore, evidence of a disability decision by another governmental or nongovernmental agency cannot be ignored and must be considered." *Id*. "Because the ultimate responsibility for determining whether an individual is disabled under Social Security law rests with the Commissioner, we are not bound by other governmental and nongovernmental agencies. In addition, because other agencies may apply different rules and standards than we do for determining whether an individual is disabled, this may limit the relevance of a determination of disability by another agency. However, the adjudicator should explain the consideration given to these decisions in the notice of decision for hearing cases and in the case record for initial and reconsideration cases." *Id*. at *7. Given this law, the Court holds that it was error not to address the 2011 decision and will remand for consideration. The Court appreciates that without medical support, that 2011 decision may not change the ALJ's ruling, but that decision should be considered and addressed.

Plaintiff's final argument, that the ALJ ignored an opinion by Dr. Will, is a misstatement of the ALJ's opinion. Dr. Will's nerve conduction findings are discussed extensively by the ALJ. (A.R. 19 ). Dr. Will's nerve conduction studies were also discussed extensively at the hearing with Dr. Stein. *See, e.g.*, A.R. 37 ("I was looking at the EMG, the electrical studies that were done which showed severe neuropathy. . . . It's severe by the electrical testing, but in terms of the clinical implications of it, I—I don't know how severe it is in terms of how far can she walk, how much can she lift, can she climb stairs, can she feel objects, does she drop things? I have no idea about any of that.").

\\\
\\\
\\\
\\\
\\\
\\\
\\\

Accordingly, the decision of the Commissioner of the Social Security Administration is REVERSED and REMANDED for further administrative proceedings consistent with this opinion, specifically to consider the opinions of the two State Agency physicians and the disability finding in Exhibit 15F.

IT IS SO ORDERED.

Dated: **November 26, 2018**  /s/ Eric P. Groj  
UNITED STATES MAGISTRATE JUDGE